ORIGINAL

FILED
MAR 23 2004
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

J.H. PARKER CONSTRUCTION COMPANY, INC. PLAINTIFF

vs. CASE NO. 04 - 471 C

THE UNITED STATES OF AMERICA DEFENDANT

## COMPLAINT

COMES NOW, Plaintiff, J.H. Parker Construction Company, Inc. ("Parker"), for its Complaint against Defendant alleges as follows:

## I. JURISDICTION

1. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §1491. Parker brings this action pursuant to the Contract Disputes Act, 41 U.S.C. §601, *et. seq.* This action is an appeal from a Contracting Officer's Decision dated April 8, 2003, under Contract No. 50-4423-0-7990.

## II. THE PARTIES

2. Plaintiff, Parker, is a corporation organized under the laws of the State of Mississippi.

3. Defendant is the United States of America. The United States is acting through its agency, the Department of Agriculture through the Natural Resources Conservation Services, (the "NRCS").

## III. FACTUAL BACKGROUND

4. On or about March 17, 2000, the NRCS issued its Invitation for Bids ("IFB") concerning the construction of a dam in Franklin County, Mississippi, ("the Project") for the NRCS. The dam is described as a High Hazard dam. Among other things, the IFB provided certain information to prospective bidders, including Parker, some of which

proved to be incomplete. At the appropriate time, Parker submitted its bid in the form required by the IFB.

5. On August 4, 2000 Parker was awarded the construction contract contemplated by the IFB which was identified as Contract No. 50-4423-0-7990, Franklin County Dam ("the Contract").

6. The Contract incorporated appropriate sections of the Federal Acquisition Regulations ("the FAR") including Section 52.249-10 Default which provides, in pertinent part, that the Contracting Officer is authorized to terminate the contractor for default only:

> "...if the Contractor refuses or fails to prosecute the work or any separate part, with the diligence that will insure its completion within the time specified in [the contract] including any extension, or fails to complete the work within [the] time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work that has been delayed."

7. The Contract which incorporated applicable sections of the FAR contemplated that Parker would be entitled to additional contract time when certain events occurred or when certain conditions were encountered. Even though Parker encountered those type conditions and those events occurred, and even though Parker properly requested that the Contracting Officer grant Parker additional contract time, the Contracting Officer wrongfully refused to grant such extensions.

8. On April 8, 2003, the Contracting Officer wrongfully terminated Parker's right to proceed further with the contract work for failure to make progress. At the time of the termination, the then existing contract time had not expired and Parker was also entitled to contract modifications granting it even more additional contract time. If Parker had not been terminated and had instead been permitted to continue with its work, Parker could

easily have finished the work required by the Contract within the contract time as extended by appropriate time extensions.

9. In addition, at the time of the termination, Parker's work area had been flooded and was under water. Parker had worked into December, 2002 when the weather conditions made the work area so wet that it was impracticable and impossible for Parker to attempt to perform meaningful work until the rain stopped, the water receded and the area dried out. The flooded conditions themselves entitled Parker to additional contract time. At the time that it was improperly terminated, Parker had approximately 15 pieces of heavy earth moving equipment at the Project site waiting for the conditions to permit meaningful work.

10. The Contract which incorporated applicable sections of the FAR contemplated that Parker would be entitled to additional contract time when certain events occurred or when certain conditions were encountered. Even though Parker encountered those type conditions and those events occurred, and even though Parker properly requested that the Contracting Officer grant Parker additional contract time, the Contracting Officer wrongfully refused to grant such extensions.

11. Other events and conditions occurred while Parker was executing its work that entitled Parker to additional contract time. For instance, in the Contract, the NRCS provided Parker with various borrow pits and designated the order in which those pits were to be worked. In the initial phases of the construction process, Parker encountered an undisclosed subsurface pre-existing land fill located in borrow pit A, which was the primary borrow area then designated for Parker's use. The existence of the subsurface land fill was unknown to Parker. In fact, during a pre-bid site visit, when a few bottles were noticed

on top of the ground, an inquiry was made and a Parker representative was told by the NRCS representative attending that visit that the site had been remediated prior to the visit and that there were no problems associated with the area. During the construction process, an underground land fill was encountered and the work in that area was delayed as a result thereof. Parker has since discovered that the Forest Service had attempted to clear the area of the debris before the IFB was issued and was, therefore, aware of its existence and location at the time that the IFB was issued; however, as noted, the IFB did not disclose the existence of this land fill to bidders including Parker.

12. Initially, the contract required an elevation of 300 ' in borrow area 4. Through unilateral Modification No. 1, the Contracting Officer changed the elevation to 305'. Approximately a month later, through unilateral Modification No. 2, the Contracting Officer again changed the required elevation to 303.6' and changed the grading plan from a flat profile to a much more difficult grading plan. These changes made the execution of the work more difficult and, as a consequence of these changes, Parker was entitled to an additional 45 to 50 days to complete its contract work; however, the Contracting Officer has refused to grant any additional time.

13. Additionally, Parker became entitled to additional contract time by reason of adverse weather. From the beginning of the notice to proceed up to October 1, 2002, Parker encountered adverse weather conditions sufficient to entitle it to an additional 35 days of contract time. The Contracting Officer has refused to grant any of that time. After October 1, 2002, adverse weather in combination with the additional contract work required by unilateral Modification No. 4 and the delays associated with its issuance, justified additional contract time from that period to the date of the wrongful termination. The

Contracting Officer has refused to grant any additional contract time for the delays experienced during this period.

14. Through September 30, 2002, the NRCS recognized that Parker was 91% complete and had only used 85 % of the contract time and described Parker's progress as "satisfactory." After being notified by Parker on October 1, 2002 that its design of the wave protection block work system on the upstream side was defective, the NRCS issued unilateral Modification No. 4. While the Modification was under consideration by the NRCS, Parker's construction operations were significantly adversely impacted and for all intents and purposes, were shut down. When the Modification was issued, it required Parker to perform additional significant work to overcome the defective design and delayed Parker's then ongoing work as a result of all of which Parker became entitled to additional contract time. The Contracting Officer did grant some additional contract time in the unilateral Modification concerning this work but the Contracting Officer did not properly account for the changed and added work and she extended the contract time by less than half of the time Parker's operations were, in fact, stopped and delayed waiting on instructions from the NRCS concerning the additional requirements that ultimately became unilateral Modification No. 4.

15. Further, during the course of construction, Parker notified the NRCS, as required by the Contract, of conditions that raised concerns of the Dam's safety. Parker warned the NRCS that it was not permitting Parker to excavate and remove enough soft soils to permit construction of this High Hazard dam and that an inadequate foundation might result. In fact, the concrete spillway conduit (a box culvert) has experienced significant structural damage as a result of settlement apparently occasioned by the soft

soils and the conduit requires significant repairs before the water can be impounded and the conduit used. The time required to make those repairs would have been added to the contract time since the existence of the problem was well known to the Contracting Officer when she issued the termination notice.

16. Likewise, a consultant to the State of Mississippi has reported that a crack has appeared in the slope of the embankment itself apparently as a consequence of NRCS's failure to permit Parker to remove all of the required soft soils. That crack requires significant repair. The time to make those repairs would have been added to Parker's contract time.

17. Although Parker was unaware at the time that the NRCS had not complied with applicable requirements requiring it to obtain the approval of the State of Mississippi for any changes addressing the design of the dam, when the defects in the wave protection block system, in the concrete box and the crack became known, Parker would have been justified and required to interrupt and stop its work until the NRCS secured the required approval from the State of Mississippi for modifications to the Contract required to address these and other design defects. As a consequence, Parker would have been entitled to such additional contract time as was required to secure that approval.

18. Apparently the NRCS has used funds dedicated to the design and construction of this project for other projects. Thus, if proper funding was unavailable, Parker would have been justified to interrupt the work on the numerous required Modifications necessary to address the design defects until funding was available with which to pay Parker.

19. Parker encountered these and other delays and was ordered to perform additional work during performance of the Contract work; and, as to each of the delays and the additional work, Parker satisfied the obligations of the Contract concerning notice and the Contracting Officer should have granted additional contract time for each. If the Contracting Officer had issued the proper modifications, Parker would have had much more additional contract time available to it than would have been required to finish the work.

20. Based on the information available to the Contracting Officer at the time the decision was made to terminate Parker for its alleged failure to make progress, Parker was, in fact, ahead of schedule, its operations were closed down due to weather conditions and a flooded work area and the Contracting Officer lacked a reasonable basis for finding that there was no reasonable likelihood that Parker could perform the remaining contract work within the contract time remaining.

21. The Contracting Officer's decision was neither authorized nor justified by the Contract and/or FAR and Parker should not have been terminated for Default. The improper termination has damaged Parker and it is entitled to a determination that the Default Termination was improper and an instruction from the Court to convert the Default Termination to a Termination for Convenience of the Government.

WHEREFORE, Parker prays:

22. That the termination for Default be converted to a Termination for Convenience; and,

23. That Parker be awarded such other relief as the Court deems proper.

THIS, the 18 day of March, 2004.

Respectfully submitted,

J.H. PARKER CONSTRUCTION COMPANY, INC.

THOMAS W. PREWITT
Mississippi Bar No. 4489
7720 Old Canton Road, Suite A
Madison, Mississippi 39110
Post Office Box 2327
Madison, Mississippi 39130-2327
Telephone: (601) 427-2327
Facsimile: (601) 427-2330

OF COUNSEL:

SAMMIE LEO ARNOLD
Ashley, Ashley & Arnold
322 Church Avenue
Dyersburg, TN. 38025
Telephone: 731-285-5074
Facsimile: 731-285-5089